You may be seated. This is N. Ray, the estate of Eric Jones v. City of Springfield. For the appellant, Mr. Mead, for the athlete, Mr. Rastak, you may proceed. This case is about quibbling on details in Monday morning quarterbacking as to what certified lifeguards did or didn't do when faced with an emergency situation created by the plaintiff's decedent, Eric Jones. I plan to discuss the error in the trial court's admission of what I call the England Rules, the internal policies and guidelines made up by Douglas England, who was a property manager at the lake at that time. I plan to talk about the failure of the evidence to support the element of proximate cause, and then I plan to discuss the absence of evidence sufficient to prove willful and wanton misconduct on the part of the City, especially when the England Rules are taken out, as we believe they should have been, and I would urge you to reverse the trial court's judgment and enter judgment now in favor of the City and against the plaintiff. If time allows, we will talk about the missing cousins. I do not intend to waive any argument expressed in our briefs by not mentioning them in this oral argument. So first, the internal rules. The first question is what does the law really require of the City or somebody else managing a pool of this nature or a lake of this nature per the regulations of the Department of Health? One, and this is right out of the regulation, they have to hire certified lifeguards, so the lifeguards come pre-trained. The City did that in this case. Two, they have to staff the beach at a ratio of one guard for 100 bathers, which the City exceeded in this case. And that's all the regulations, that's all the law requires of the City. It doesn't say anything about how the lifeguards are supposed to do their job. It's just that they're to be certified and that they're to be provided at that one to 100 ratio. It requires no training by the municipality beyond what the guards master in their certification process. That's what the training certification process is to provide. And a lot of municipalities, a lot of private pool owners wouldn't have the resources to have ongoing training, so the law requires you get the pre-trained guards who are certified, recertified, and in that way the public is protected. That's why the law requires that. There's been no showing whatsoever that the defendant violated the law. The case was built almost entirely on the England rules. The supposed internal guidelines of the City, handwritten on a piece of paper by a CWLP property manager who had never been a lifeguard himself. Counsel, I have a question for you. I understand what you're saying. For me, the difficulty came about because we had what the law required, then we had this memo, or I don't know, saying memo seems too formal given that it was just kind of scratched on some paper, and then you had the expert testimony regarding standard of care for lifeguards. How does that all fit together? I mean, what was the requirement? Did they meet the standard of care? Was that testimony inappropriate? Well, the testimony is rather whimsical when shifting from the plaintiff's expert, but essentially the law requires just what the law requires. The only thing required, whether the retained expert thinks it's better practices or not, is that staffing ratio, is the fact that only certified lifeguards be hired. Now, the thrust, if you will, of Mr. Ebro's testimony anyway was that we violated these You should have ongoing training about this, that, and the other thing. But we've already dispensed with that because that's why you hire certified lifeguards. So that's why the law requires you hire certified lifeguards in the first place. Especially if you don't have the wherewithal to try to provide an accommodation for the public, like a nice swimming area, but you can't provide some sort of training staff to continually be doing this. I mean, the public is protected by hiring those guards. Well, it seemed to come down to this line not being formed quickly enough. Yes. And wasn't that really more a part of the expert testimony? Yes, but that gets into the emergency action plan and which one is appropriate, and which I will say I can't find where I did object to that in the record, so that doesn't exist. However, it was confusing about the way the emergency action plans were portrayed. I think by the time it was all said and done, the lawyers can look back through the record and say, oh yeah, here it's pretty clear. And the point I emphasize, frankly, for the jury, it's pretty clear that when there is a situation where a bather is missing, we don't know where this person is. All we know is he's in the water somewhere. Now he's gone. You go to his last known reported area, and you search there, which is, to me, common sense. I mean, times of the essence. You frantically then, and perhaps not frantically is not the best word, but you assemble the search based on that location. And that's what happened here. I mean, you can criticize how, you know, where the guards were in the, did they hear a whistle immediately? Did they come? But what they did do was go to that area. The area indicated, you know, there's dispute. Well, we said here, but there's pretty overwhelming testimony from the other guards, particularly that they were indicated that the body was, the person was last seen out by the sea wall. You go there, and they did essentially do a line search at that point, albeit it's deep so you can't like hold arms and stuff. But you're doing these pencil dives in an organized manner, and that's what they did. So, you know, even the county. If one of the things that the city does to help and protect baiters, swimmers, is to hire certified lifeguards. The people they hired are certified. People are working for them. How about laxity in how quickly they responded or how they responded? I mean, forgetting the London rules, would the city be responsible if the jury believed that the lifeguards were not diligent? No matter how many of them there were. Right. I don't believe that that was the case, but assuming that were true, if they weren't diligent, I, you know, I don't think the law provides that they're required to go about the business of rescuing in a certain way, if that makes any sense. Because we started where there used to be a, it was a blanket immunity against any liability. We've gone over to Wilflin-Wyanton, and that previous scenario, I'm sort of thinking this through with your question as we go. It would have been, you know, the lifeguards could have stood around and watched somebody drown, which is one of the effects of what the policy of the plaintiff urges here. Because they're like, once you undertake a rescue, you have to do it correctly. So, well, fine, I won't undertake the rescue, therefore I don't have to do anything. To me, that's an absurd contention that the plaintiff stressed throughout this trial. But you have to do so, I guess, under the amended immunity statute. You're immune, you know, unless you're guilty of Wilflin-Wyanton misconduct. So if you wantonly, help, help, I need help, okay, I'm going to go get a hot dog first, you know, something absurd like that, then I would see that there could be liability. Now, factually, do we have this in this scenario here in front of us? I don't believe there's anything close to that. But I think it is a possibility to have, in other words, you can violate the law by not having certified lifeguards, or the proper ratio, or you can be Wilflin-Wyanton in the execution of your job, and the city could face liability. I think that's a true statement. If Parks and Rec, or whoever is responsible for the lake, if they were to adopt a policy, which nonetheless would be an internal policy, but they would say, we intend to exceed the standards required by state law, and then that's posted and the lifeguards read it, would that be relevant? Only if it were adopted as an ordinance by the city. Because it has to, the cases I've relied upon emphasize that enactment, and if it's just, like in this case, we don't have that situation, but we have, you know, a guy, a property manager, city's on his backside because of a complaint, hey, here's these rules. And well, and they were never really, apparently the rules, because the lifeguards certainly hadn't heard of them, and I think they had better rules, frankly, when you dissect the reasoning behind their policies for what they did, I believe it was safer for the bailiffs. So, anyway, the case was built on the England rules, as we said, and the support, the supposed internal guidelines of the city, handwritten piece of paper, let me catch up with my notes. The substance of the policy is disputed, that is what it were, the England rules. But even if we concede those, it seems more credible that the professional lifeguards would know the better policy, not the property manager. But either way, the England rules should never have been admitted into evidence. And this long line of cases, if we start with Rhodes versus Illinois Central Gulf, which is a Supreme Court case in 1996, where the law does not impose a duty, one will not generally be created by the defendant's rules and internal guidelines. That's a case that's cited long after Darling, it was from 96, I think Darling was 64, if memory serves me. So, counsel, is it your position that basically the jury, in hearing the England rules, as you're calling them, imposed a duty based on those rules, and that's why it decided the way it did? Yes, and that was the entire gist of the plaintiff's case. And I kept reading over and over again the docket entry from the judge in determining whether or not that evidence would come in, and the docket entry says that the memorandum is evidence the trier fact may consider to determine whether or not the defendant violated the ordinary standard of care. Before that, it said that the memo did not impose a standard of care upon the defendant or duty, but that it can be used to see if there was a violation of the ordinary standard of care. What does that mean? I just, I read it over and over again. I'm like, well, what, you know, you're saying you can't use it for this, but really, in effect, you're saying, yeah, you can use it for this. And that became the thrust of the plaintiff's argument. They did, indeed, use it exactly as that, to say, look, here's the standard of care, their own standard of care, they did live up to it, therefore, they're guilty of willful malign conduct. So, I thought it was, dare I say, pretextual to argue that there was some distinction between using it as a duty versus evidence of violation of the standard of care. I'm sorry, it just made no sense to me. And I could never really reconcile it intellectually with what the court was saying. All I knew is it was coming in, and it shouldn't have. I mean, from my simple way of thinking. Darling, in Rhoad's case, the Supreme Court case, I think it's really on point, because they spotted a guy who was drunk in a railroad station. And it was cold, and their policy was call the police. They did that. Their policy was also call your own security guards. They didn't call their own security guys. And so liability was premised on that violation of their internal rules. And the Supreme Court said, no, we're not going to do that. Blankenship, the third district case, I think, is particularly apt in this case. Because it's a swimming pool case. It was cited by Rhoad's. And the third district held that swimming pools internal rules cannot be used by a plaintiff as the way the plaintiff used England rules here, as the court held in the Supreme Court in Rhoad's approved. The quote is, I know I'm not sure if it's a quote, but I think it's particularly apt. Furthermore, we reject plaintiff's argument, said the Blankenship court, that a duty arises from the park district's internal rules, which required at least one lifeguard to remain on duty during the adult swim period. While the violation of a statute or an ordinance designed to protect human life or property is prima facie evidence of negligence, a legal duty is not normally established through rules or internal guidelines. And the failure to comply with self-imposed regulations does not necessarily impose upon municipal bodies or their employees a legal duty. So these, like I said, were never enacted, never given the force of law. If the city council said, you know, we passed these rules, this is what you will do, that would be a different sort of thing. But that's not what we have in front of us. So it was obviously prejudicial. So fourth district case, Philpott versus Midway, same thing. Airports own policies as to when they shovel snow and things like that, and property use those to create duty. Young versus Forgas, right here out of Springfield, the fire department running the red light case. The court held, we have already established that defendants' liability will derive, if at all, from a violation of Section 5106 of the Tort Immunity Act, which requires a finding of willful and wanton conduct. Internal rules and procedures, like the operating procedures of the fire department here, do not impose a legal duty upon municipal entities or their employees. And the public policy, I think, is obvious. You know, I mean, if you say today that, you know, these internal rules for safety, they're going to set the standard of care for you. The memo goes out tomorrow, throw away all those internal rules that we put because we wanted to be safer. You know, if we're going to encourage safety, if we're going to encourage municipalities to be even safer than the law, then we can't establish, you know, through public policy, a rule that will hoist them by their own petard if they do so in a civil case like this. Approximate cause. This is a, you know, this is not an intersectional case. This is a difficult case. It's lake water. It's muddy water. One of the experts, I think mine, said, look, you can have a guy slip right in there and be watching where he slipped, and you may never find him. There's been this presumption that lifeguards guarantee rescue, or lifeguards have a magic wand, and they can just pull these people out in all circumstances, and it's not the case. People drown all the time despite the best care. Now, in this case, there's no evidence sufficient to support that anything these lifeguards did or didn't do was the proximate cause or a proximate cause of this gentleman's death. We have the delay in reporting to the lifeguard, an unknown number of minutes, you know, by his own companions who were there, you know, depriving them. Was he already dead? We don't know. There was no evidence offered by the plaintiff to establish that he was not, that he could have been rescued. The one, they asked the question that it was sustained against their, the objection was sustained against their experts. So that never came in. We don't know the amount of the delay from his companions. It has been shown, yeah, that even in optimal services, even in pool situations where you have chlorine, you have clear water, there's no guarantee a lifeguard is going to be able to find and rescue a bather in that time, because it's a very short amount of time you have to pull that off. Especially when you're, according to the testimony of the lifeguard, you're misdirected as to the last known location of the bather, then you lose all that opportunity. So we don't believe the proximate cause has been shown either. Manifest weight. If we take the England rules out, I don't think that there's enough to support a cause of action, and I think it would justify if the court holds those rules were improperly admitted. If you look at all the other evidence, I don't think we get to the point where a retrial would be necessary. I think the court can say, as a matter of law, there was not a conscious disregard, an actual or deliberate intention to cause harm, or an utter indifference to, or conscious disregard and safety of others, which is Wilflin bond conduct. With that paucity of evidence, taking out the England rules, I don't think we get to the level where Wilflin bond conduct is shown, and this court can simply enter judgment in favor of the defendant without remanding it for a new trial. Otherwise, we request a new trial on all issues. The evidence shows just the opposite of indifference or conscious disregard, and I've gone through that in the briefs. I probably need them for you. With all the training, they hired only certified lifeguards. They staffed the beach with twice as many guards as the law required. There were thought-out rules as to where they would sit. I mean, the lifeguards themselves said, yeah, well, you can't really watch safely the bathers going off the board from the platform because the board itself is in the way. Much better to do as Denis Caveney did, and sit here in this chair and watch this area. So, I mean, these things are not spontaneous. They're not disregard. They're a deliberate, thought-out, and well-followed procedure, and certainly not Wilflin bond conduct. The city provided this beach signage, and as far as the rescue aspect of it, they heeded what the witnesses said. They didn't ignore them. They emergently searched. They didn't just blow it off. They did blow the whistle. That's been established over and over again, and they used their professional judgment, and they cleared the beach in an attempt, you know, attempted the proper type of last known location rescue. I guess that's yellow. I'm kind of colorblind, but... It is still yellow. Just from the point of view of the missing witnesses, this is a brief comment. I think when you have a family that doesn't come, I think we're entitled to that negative inference when there's been no showing as to why they weren't there, and should be presumed that they would have testified one way. So, my time being up, I thank you. Thank you, counsel. We'll hear from you on rebuttal. Mr. Rastak. Good morning, your honors. Michael Rastak. I'm here on behalf of the plaintiff's affilee, Mary Arborough. As to the first point that they emphasized to the court, it was never the position or the argument of plaintiff at trial that the memo created a duty. That just wasn't an issue at trial. The duty was described to the jury in the jury instructions. So, how does it come in? It comes in because it's evidence of the standard of care that the city was obligated to follow in fulfilling or not fulfilling that duty. Similar to the rules, the internal rules, the internal guidelines, the internal policies that you see in almost every case where you've got somebody in charge of a facility. You saw it first years ago in the Darling case that we cited, where the hospital's internal guidelines and rules and policies came into play. Not to establish a duty. The duty was due care to take care of the patient. But they showed the standard of care had been violated. It was evidence that somebody had done something wrong because the nurses and doctors there had not done what the hospital said they should do.  The standard of care would be the same standard of care in any case, the duty of exercise due care to refrain from willfully and wantonly injuring somebody. The standard here is because we have to prove willfully and wantonly, I have to put that into the definition. That's all. It's a very simple standard. They set up, the city set up a beach. They put up lifeguards. They put up buoys. People came there in reliance upon it. There was never a question at trial about what the duty was. Nobody moved for summary judgment at trial or for a directed verdict on the grounds that the city did not owe a duty. The question is, did they fulfill the duty? And what could we bring in to show that they did not fulfill the duty? How does the statute that outlines the city's requirement as far as the lifeguards and all that, how does that come into play with the standard of care or the duty? It's something, and my memory serves me, it's something they could argue to the jury to say, look, here's what the statute said we had to do. And we did better than that. That means we did not violate the standard of care. And that means we fulfilled our duty. Our response was to the jury. It wasn't your response. They didn't follow their own rules. Absolutely. And it was way more than that. When you start to look, when this trial started, the memo, it really is a memo, the memo seemed to loom large. But as the trial went on, as the court's aware, the evidence began really to focus on no training. Nobody knew what to do. The people involved said we didn't know what to do. And also on the rescue itself, what the Woodrums called the chaotic occurrence or circumstances surrounding the evidence. That's what really showed the jury what occurred here. And if I can remind the court, Mr. Englund was on the stand, and he said what was in that memo is what the lifeguards were supposed to know. It was there anyway. If the memo isn't there, we would still be allowed to ask Mr. Englund, what did you tell your lifeguards to do? He's not just some entity. He's the one that- Why are you allowed to do that? Because that would- Mr. Englund's a property manager at CWLP. He's also the person that's in charge of the beach. He's the only person that we can see on the record that's in charge of the beach. He's the one that everybody, each one of the lifeguards said, Mr. Englund is the one that told us what to do. So if he tells them something that's over and above what's required by law- Yes. You can argue to the jury that if they violated that, they will form one. We can tell- Yes, we can. We can argue to- We can explain to the jury that here is an element, just like in Darling, just like in Hudson, the directive in Hudson from the police department on the chase rules. Here's something that tells the people at the scene what to do, and they didn't do that. Now, counsel, you've conceded that the Englund rules don't impose a duty. That's correct. We've never argued that. But yet you say you can use those in the alleged violation of those rules to say they violated the standard of care. That's correct. How can it be part of the standard of care if you cannot impose a duty based on it? Because the duty is to use- Normally the duty, it's easy to say, so you have a duty to use due care. When I don't use due- to see whether I use due care, we look to what the people in the business say is due care. If it's a construction site, you bring in the policies from the construction manager, the construction company. It's done all the time. It's almost standard in a construction case. If you have a trucking accident, you bring in the trucking company's rules on how many hours you can drive. But is it different here given that we have the statute that outlines what they're responsible to do as far as who they hire and how they conduct themselves and the fact that this is a pool and basically wanting to encourage people, well, municipalities to be safe, but yet not impose liability unless it's willful and wanton conduct. Doesn't that make this a little bit different than what you're citing as far as construction cases and the hospital and things of that nature? I think not. It's the same in every event, in the hospital, the construction site in Hudson. The purpose of the internal rules in every case is to hopefully make things safer so we don't end up with either on a humanitarian side so we don't have people hurt or on a business corporate side so we don't have to engage in litigation. And if we look at the, for example, if you look at the Hudson case, the internal rules on police pursuit that limit the cars involved in the police pursuit are to prevent accidents from happening. Was there a statute that addressed that? No, not in that case. But we have a statute here, right? And the statute here, all the statute here tells you how many lifeguards you have to have. Actually, it doesn't even tell you that you have to have them in the church. It says how many you have to have. The question here was not how many should they have had but whether they should have been in the chairs that were there. And that's really all that the rules came down to. Because it required that they be certified lifeguards? That they be certified? Does the statute require that? Yes, and they were certified. But it turns out, I understand the argument was, well, we didn't have to check them. It turns out that they weren't trained. And the lifeguards themselves, the court will recall, said, we need to be trained. We need to practice the EAPs, the emergency action plans. And most of them said, no, we did not do that. What was the, your expert testified about the use of the chair? Yes. Or chairs? Yes, correct. And how did the lifeguards respond? The lifeguards response was twofold. One, they didn't know that they were supposed to have three people, one in each of the three chairs. Some of them just did not know that because they never saw the memo. And the other response was they thought that they could better observe. Counsel was right. One of them testified, we thought we could better observe the diving platform from this chair. And the expert said, well, that's impossible. You need to have somebody on that diving platform. So that was the question for the jury. Should you have had a guard back here and out of the chair? Or was there also somebody said there was a chair we never used? That's correct. There was a chair out on the break wall that was just never used. The real question here was, there should have been three people on. But that's more people than the statute even requires that they have out there on that day based on the number of swimmers, right? That's correct. On the other hand, they did put the chairs there. They put the chairs in each place. I think if you come to the beach, if you come to that beach, you expect to have, I believe, people rely upon to have a safe system. Now, the people on the beach don't know that there should be one here and one here. They just see chairs there. But the experts have said here, yes, that's why you have them there. So that the general reliance of the public is fulfilled. I don't know that we have to say that, prove that the public said that the public here, we relied upon, we only went there because we knew there were ex-lifeguards out there. And the testimony was that if they had the number of lifeguards that apparently the whole country says you need to have these people out there, they would have seen what was happening sooner. And what we needed here was early recognition of what was going on, or more accurate recognition of what was going on. And keeping in mind, again, that we have more than that here, the real issue became the training. There was no training. I mean, the lifeguards said we weren't trained. They didn't even know there was a memo. They didn't know there was an action plan, some of them said. The emphasis was that we need to do this all the time, because we need to be able to get from here to that water in x minutes, in x seconds. And that's what the experts said was so critical. And then the bottom line was the completely separate count. Unrelated to the memo count, so it stands independently whether that was right or wrong, was that the lifeguards themselves were willful and wise. Because Your Honor, as you recall the testimony, it was called chaotic. The first one, the key young testified, they wouldn't do what I wanted them to do. The Woodrum said they'd just stand there and look at each other. These are all young people, 17, 18 years old, I think. But they're put out there to save lives, and it's a serious business. You need to know what you're doing, and you need to be trained to know what you're doing. That was the evidence, not me. The experts said you need to be trained to know what you're doing. So this doesn't happen. And they weren't trained, which is completely separate from the memo. And they did not respond well. Even their own expert really could not defend what the lifeguards did or did not do. Counsel emphasized the, I would say, the good testimony. But the bad testimony was they made terrible mistakes out there. They didn't understand what they were doing. If they knew what they were doing and had listened to what this testimony was, they would have done the line search at the chair. Experts said you would have found him within seconds. You would have had him out of the water in a minute and 35 seconds. And in terms of proximate cause, our expert testified without objection that he would have been saved because you can resuscitate somebody within three minutes of being submerged. There was never any objection to that. There was an objection. It wasn't raised during the oral argument. There was an objection in the motion in limine to the lifeguards talking about whether or not you could save the person. But there was no objection in the motion in limine to whether the experts could testify about what would be the result if you could rescue them within a fixed time frame. So that came in without objection. So in terms of proximate cause, the jury heard our expert say that if they had done this properly, he would have been out of the water, Eric would have been out of the water in a minute and 35 seconds, and that you can resuscitate somebody within three minutes of going under. That was unopposed. Their expert, I don't believe, said anything about that. Their expert agreed. And if you're on his recall, it turned out in New Jersey, I think their expert put it at the same time frame. The other question that counsel raised was the willful and wanton aspect of the case. And again, going back, we didn't say that the duty itself was affected by the Anklin memos. What we simply said was that when you have a circumstance where there's evidence that nobody trained them, that alone, I would think, would send it to the jury, because the people involved said we needed to be trained. We didn't do it properly. It was chaotic, which showed that they didn't know what they were doing, and they were acting indifferently. If it wasn't the lifeguard's fault, this doesn't change the picture, because they should have been trained by the city. The bottom line is that whatever was done here, by the city or by the lifeguards, whether it originated, whether the chaos described by the woodrooms originated in the training or in the inability of the lifeguards to respond as they were supposed to respond, led to the injury or led to the death of the talent. Aren't lifeguards trained when they're certified? Don't you have to be trained more? Yes, there's a certification program you have to go to. But if you've called a testimony, you have to practice this all the time. There's two answers to that, actually. One is the evidence was you need to practice this all the time. That's what Young said, and more than Young said, because you need to get good at it. You need to do it in a time frame. And that wasn't done here. And secondly, the emergency action plan is part of this, and the lifeguards didn't even know about that. You have to follow the emergency action plan. Whether you're certified or not, you still need to follow the EAP, it's called. They didn't do that here. They did not form the line search immediately, as they should have. You ought to recall, even Mr. England admitted that under his EAP, that first, you wanted to see where the person had been, and then you should search the locker rooms. And that's what they told the young man to do. They go back and make sure he's not in the locker rooms. And then they did the line search, and that's just not right. If the jury believed them, that's fine. We would have lost the case. But they didn't do what they were supposed to do here. Certified or no, they had to follow the standard of care for lifeguards. Certified or not, the evidence was there is a standard of care. They agreed you need to follow that plan. They all agreed this is what you should do, and they did not do it. That's the evidence from our part. If they had done that, we would have had a different result. And we wouldn't have had what happened. Unless the court has further questions for me. We do not. Thank you. Thank you. Rebuttal? Thank you. The memo didn't create a duty. It was a standard of care. It's perpetuating the same circular argument that people who have to be smarter than me, perhaps, understand in academia. But I don't know what the difference between the standard of care is and the duty is. Because the duty is negligence. The duty is not to do willful and wanton conduct. Well, how do you prove that duty? By the standard of care, which is they should have done x, y, and z. So the standard of care is the duty, because the duty can't be shown without showing the violation of the standard of care. And to me, it's all just a false distinction to try to get around the line of cases such as Flankenship, Forgas, and cases like that, which say you can't use this internal guidelines as the standard of care, as the duty. What if you don't call it the standard of care? And you just say, everybody concedes they have a duty. Now, we're going to tell you what the lifeguards did, what they didn't do, what suggestions they've been given, what the expert says they should have been trained in regard to. Yeah, I agree. If the duty exists, then you go forward from there. You don't call it the standard of care. The witnesses testify, and the expert testifies. I agree with you completely. I don't think that there's a real distinction between the terms. That's why I think it's just used confusingly to try to avoid the strong line of precedent, which says you can't use this type of evidence to show the duty of the defendant. So maybe I'm not understanding you, but I think we're saying the same thing. I don't think we are. OK. Darling is an app. The Darling line of cases I showed in the reply brief, that's its own separate little thing having to do with how hospitals are certified. I'm not here to litigate construction cases. I've done my share of them. Ocean standards and things like that can come in. I don't know of any internal regulations or rules that do. It's got to be something that's enacted like a law or like an ordinance for it to be admissible. There's supposed to be a lifeguard in the shallow end. There's supposed to be a lifeguard in the deep end. The law doesn't say where you're supposed to be put. That's just the way they did it out there. Both of these lifeguards, or frankly, one of these lifeguards, since there was only 35 bathers present at the time, could have been strolling up and down the beach. And as long as they were on duty, that's fine. The plaintiff suggests that just because the city, over the course of a very long number of years of having this lake out there, well, there was these decrepit chairs out on the seawall. You should have had somebody just because there was a chair there. Or you should have had somebody in the chairs over in the park that was roped off and no longer used for swimming just because there was a chair there. It's nonsense. You have to have one per 100. They had two for 35. They stationed them, I think, logically, one in the deep end, one in the shallow end. That was their understanding of the rules. If there's one person in the shallow end, we've got to guard there. If there's one person in the deep end, we've got to guard there, too. So I think the city did above and beyond what was required of it to try to provide safety. The EAP, we've seen what I think was the intentional confusion of EAP issue at trial perpetuated here again. The EAP, as each and every one of the people testified, including the plaintiff's expert, was you go to the last known place where the bather was seen. That's the EAP for a missing bather, location unknown. OK? You don't do a line search unless someone turns up missing and you didn't see where they went. Then you're doing, essentially, a body recovery search. You're lining up at some arbitrary point in the lake and starting a search to find where the body is. That was never the scenario, but we saw that confused time and time again at trial, and even here today in Coral Island. So with all that, I'll stop and thank you. Thank you, counsel. We'll take this matter under advisement and await the readiness of the next case.